IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Alicia D.,[1] | ) | C/A No.: 1:21-2249-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi,[2] Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Donald C. Coggins, Jr., United States District Judge, dated July 26, 2021, referring this matter for disposition. [ECF No. 10]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 6].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Fed. R. Civ. P. 25(d), she is substituted for former Commissioner Andrew Saul as the defendant in this action.

Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

On April 17, 2020, Plaintiff filed an application for SSI in which she alleged her disability began on April 20, 2016. Tr. at 157, 255–65. Her application was denied initially and upon reconsideration. Tr. at 176–79, 183–86. On January 28, 2021, Plaintiff filed an application for DIB that was elevated to the hearing level. Tr. at 15. On February 10, 2021, Plaintiff had a hearing by telephone before Administrative Law Judge ("ALJ") Richard LaFata. Tr. at 68–136 (Hr'g Tr.). The ALJ issued an unfavorable decision on May 11, 2021, finding Plaintiff was not disabled within the meaning of the Act. Tr. at 12–33. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff

brought this action seeking judicial review of the Commissioner's decision in a complaint filed on July 22, 2021. [ECF No. 1].

### B. Plaintiff's Background and Medical History

#### 1. Background

Plaintiff was 43 years old at the time of the hearing. Tr. at 75. She completed a master's degree. Tr. at 79. Her past relevant work ("PRW") was as a vocational training instructor, a cashier/checker, a cosmetologist, a beauty shop manager, a customer complaint clerk, and an administrative secretary. Tr. at 119–20. She alleges she has been unable to work since April 20, 2016. Tr. at 256.

#### 2. Medical History

Plaintiff complained of stress related to family situations on July 1, 2016. Tr. at 2196. She indicated she was not taking her psychotropic medications as prescribed and continued to smoke marijuana daily. Tr. at 2197. Licensed Clinical Social Worker Telia Y. Virgin ("SW Virgin") stressed the importance of Plaintiff's medications, and Plaintiff agreed to resume them. *Id.*

Plaintiff requested to see SW Virgin as a walk-in on July 25, 2016. Tr. at 2194. She was depressed and crying and stated she cancelled her last visit because she was unable to get out of bed. *Id.* She complained of stress due to an abusive relationship. *Id.* She admitted she had been noncompliant with

psychotropic medication. *Id.* SW Virgin encouraged medication compliance. *Id.*

On July 28, 2016, Plaintiff reported she had resumed all her psychotropic medications and had stopped smoking marijuana daily. Tr. at 2192. SW Virgin noted Plaintiff appeared calm and her affect was full range. *Id.*

During a medication reconciliation visit on August 12, 2016, Plaintiff reported she could "see clearer" and the change in medication had slowed her thoughts. Tr. at 2186. She endorsed periods of crying, sleeping approximately four hours per night, and sometimes hearing voices and seeing a person. *Id.* She said she felt as if something were crawling between her toes and up her arm after taking Quetiapine. *Id.* Jeffrey Meyer, M.D., described Plaintiff as alert, oriented, casually dressed, adequately groomed, maintaining fair eye contact, having normal rate and volume of speech with dysphoric tone, and showing no psychomotor slowing or agitation. Tr. at 2187. He further noted Plaintiff had a depressed mood, a restricted affect, and was tearful at times. *Id.* He indicated diagnoses of chronic posttraumatic stress disorder ("PTSD") and major depressive disorder ("MDD"), continued Fluoxetine 40 mg for depression and anxiety, and increased Quetiapine to 50 mg at night for mood stability and sleep. *Id.*

Plaintiff presented to SW Virgin for counseling the same day. Tr. at 2189. She reported seeing a woman named "Alice" that no one else could see. Tr. at 2190. SW Virgin noted Plaintiff's effort to verbalize her concerns over her medications to the psychiatrist was a sign of improvement. *Id.* She stated Plaintiff was calm and her focus had improved. *Id.*

On August 22, 2016, Plaintiff reported taking her psychotropic medications as prescribed with resulting improvement in mood. Tr. at 2182. She indicated she had decreased her marijuana use to every other day. *Id.* She described an incident in which her partner became angry, knocked items off her dresser, and ripped up her clothing. *Id.* She expressed a desire to end the relationship. *Id.* Plaintiff endorsed mild depression, anxiety, reduced appetite, lethargy, tearfulness, and poor interest and motivation. *Id.* SW Virgin noted Plaintiff verbalized a willingness to work toward goals and had improving insight. Tr. at 2182–83.

Plaintiff presented for a recheck of asthma-related symptoms on August 25, 2016. Tr. at 2175. She reported using her Albuterol inhaler several times a day. *Id.* She also complained of right shoulder pain with internal and external rotation and a rash on her feet and legs that failed to respond to steroids and antifungal treatments. *Id.* Wenda E. McCutchan, M.D., noted diffuse tenderness of the right shoulder, painful internal and external rotation, and restricted motion. Tr. at 2176. She assessed stable

migraine, depression improved on current therapy, and poor asthma control. Tr. at 2176–77. She ordered magnetic resonance imaging ("MRI") of the right shoulder and pulmonary function tests ("PFTs") and indicated Plaintiff should start a steroid asthma medication after undergoing the PFTs. Tr. at 2177.

The MRI of Plaintiff's right shoulder showed supraspinatus tendinopathy with anterior rim rent type tear, no tendon retraction, and mild subscapularis tendinopathy. Tr. at 2304–05.

Plaintiff presented to Urgent Care for pain related to right shoulder tendinopathy on September 11, 2016. Tr. at 2156. Wesley Bow, M.D., ordered a Toradol injection and Prednisone and instructed Plaintiff to use a sling and follow up with her primary care physician and an orthopedist. Tr. at 2152–53.

Therapy assistant Craig S. White fitted Plaintiff for a lumbosacral corset orthosis and four-way knee supports on September 12, 2016. Tr. at 2147–48. He issued a straight handled cane and educated Plaintiff on its proper use. Tr. at 2148.

Plaintiff reported taking her psychotropic medications as prescribed on September 19, 2016. Tr. at 2143. She complained of shoulder pain and feeling unsupported by her emotionally-abusive partner. *Id.* She endorsed depression, anxiety, decreased appetite, lethargy, tearfulness, poor interest

and motivation, and auditory hallucinations. *Id.* SW Virgin indicated Plaintiff had improving insight and was willing to work toward goals. *Id.*

Plaintiff participated in counseling on October 17, 2016. Tr. at 2134. She reported she had stopped taking her psychotropic medications as prescribed. Tr. at 2135. She indicated she was attempting to move to South Carolina to escape her emotionally-abusive partner. *Id.* She endorsed depression, anxiety, reduced appetite, lethargy, tearfulness, poor interest, poor motivation, and auditory hallucinations. *Id.* SW Virgin encouraged Plaintiff to take her psychotropic medication as prescribed and indicated she was willing to work toward her treatment goals and had improving insight. *Id.*

Plaintiff underwent arthroscopic surgery to repair a right supraspinatus tear on November 11, 2016. Tr. at 2071.

Plaintiff presented to Ralph D. Mazzochetti, D.O. ("Dr. Mazzochetti"), for primary care initial evaluation on January 20, 2017. Tr. at 2092. She reported a history of PTSD and requested a mental health consultation. *Id.* She indicated she had recently undergone right shoulder surgery and requested a physical therapy referral. *Id.* She complained of bilateral knee pain she described as a pulling sensation when she stepped down and noted intermittent swelling. *Id.* Dr. Mazzochetti noted normal findings on physical exam, aside from slightly-decreased muscle strength in the right shoulder

due to recent surgery. Tr. at 2094. He continued Plaintiff's prescription for Fluoxetine, ordered a mental health consultation, prescribed Fioricet for headaches, continued Meloxicam for shoulder and back pain, prescribed Albuterol for asthma, and referred Plaintiff to physical therapy. Tr. at 2095.

Plaintiff presented for a physical therapy evaluation on February 2, 2017. Tr. at 2084. She reported right shoulder stiffness and pain. *Id.* Physical therapist Paul A. Anama ("PT Anama") noted reduced range of motion ("ROM") of the right shoulder, minimal tenderness in the right supraspinatus, and 3/5 strength in the right shoulder. Tr. at 2084–85. He recommended treatment twice a week for six weeks. Tr. at 2086.

Plaintiff presented to Kyle R. Flanagan, D.O. ("Dr. Flanagan"), for a mental health medication management intake on February 9, 2017. Tr. at 2075. She indicated she had recently moved from Fayetteville and desired to continue use of Quetiapine and Fluoxetine. *Id.* She requested a therapist, but preferred counseling not be in-person. *Id.* She said she felt nervous and angry, and Fluoxetine made her feel tired. *Id.* She reported a history of abuse during childhood and sexual assault in 2007. *Id.* Dr. Flanagan noted mostly normal findings on mental status exam ("MSE"), aside from "down" mood and constricted affect. Tr. at 2078. He stated Plaintiff appeared to meet diagnostic criteria for chronic PTSD secondary to sexual and physical traumas during childhood and military sexual trauma during active duty service. Tr. at 2080.

He indicated Plaintiff's description of depressive symptoms did not appear to meet criteria for a diagnosis of major depressive episode. *Id.* He considered Plaintiff's depressive symptoms to be related to either persistent depressive disorder or substance-induced mood disorder. *Id.* He increased Fluoxetine to 60 mg at bedtime, discontinued Quetiapine, and prescribe Prazosin for nightmares. *Id.* He explained to Plaintiff that marijuana had potential negative effects on her symptoms and encouraged her to cut back or abstain, but she was not interested. *Id.*

Plaintiff attended physical therapy sessions for her right shoulder on February 21 and 23 and March 1, 2017. Tr. at 2071–74. She rated her right shoulder pain as a six on March 1, 2017. Tr. at 2071. She indicated her slow progress was causing her to feel a little down. *Id.* PT Anama noted slight improvement in Plaintiff's pain and ROM. *Id.*

On July 12, 2017, Plaintiff reported she was smoking more marijuana. Tr. at 2050. She said she was not interested in evidence-based therapy because it would not help her nightmares. *Id.* She requested medication refills, but indicated her medications did not work and only prayer worked. *Id.* She reported two nightmares per month and stated she would take Prazosin in the middle of the night, after she woke from a nightmare. *Id.* She denied struggling with anxiety, except when confronted with crowds or loud areas. *Id.* Dr. Flanagan attempted to engage Plaintiff in a discussion of more

9

evidence-based treatment options and to challenge her beliefs that increased use of marijuana and restricting treatment to prayer may be limiting her chances of improving her symptoms. *Id.* However, Plaintiff did not respond well and ended treatment. Tr. at 2051. Dr. Flanagan continued Fluoxetine 60 mg and Prazosin 1 mg. Tr. at 2054.

On August 4, 2017, Plaintiff complained of a headache lasting two weeks and accompanied by nausea and vomiting. Tr. at 2043. She also endorsed bilateral knee pain, burning, and popping. *Id.* Dr. Mazzochetti noted some crepitus and tenderness to ROM testing of Plaintiff's knees. Tr. at 2045. He discontinued Methocarbamol and Meloxicam and prescribed Sulindac 200 mg twice a day and Capsaicin 0.025% cream for knee pain. *Id.* He also prescribed Fioricet for headaches and referred Plaintiff to the gastroenterology clinic for constipation. *Id.*

Plaintiff presented to physician assistant Hayley Plant Bryan ("PA Bryan") for gastroenterology consultation on August 8, 2017. Tr. at 2037. She reported chronic constipation that led to nausea and vomiting, as well as weight gain, bloating, gas, and tenesmus. *Id.* She indicated she had tried multiple medications and dietary changes without improvement. Tr. at 2040. PA Bryan prescribed Linzess. *Id.*

On August 15, 2017, x-rays of Plaintiff's knees showed bilateral, mild chondromalacia patella. Tr. at 2302–03.

10

Plaintiff underwent diagnostic colonoscopy on October 2, 2017. Tr. at 2017. Thomas Eustis, M.D., discovered one polyp in Plaintiff's rectum and removed it. *Id.* The polyp was benign. Tr. at 2013. Plaintiff also underwent an esophagogastroduodenoscopy ("EGD") that showed a normal duodenum, stomach, and esophagus. Tr. at 2018.

On November 9, 2017, PA Bryan noted the recent EGD and colonoscopy showed no significant abnormalities. Tr. at 2001. Plaintiff reported weight gain. *Id.* She endorsed multiple stressors and indicated her PTSD symptoms had worsened. Tr. at 2007. PA Bryan noted Plaintiff was very tearful during the visit. *Id.* She continued Lubiprostone 24 mcg twice daily. *Id.*

On February 2, 2018, Plaintiff reported Lubiprostone had initially improved her constipation, but had become less effective over time. Tr. at 1978. She endorsed straining and hemorrhoids, as well as upper abdominal pain and nausea. *Id.* PA Bryan discussed risks and benefits of anorectal manometry, but Plaintiff declined it. Tr. at 1984. She indicated Plaintiff should use Preparation H nightly and Lubiprostone as tolerated. *Id.*

On February 15, 2018, Plaintiff reported stopping Prazosin and Prozac due to feeling they were not as helpful as marijuana. Tr. at 1975. She endorsed nightmares, depressed mood, and impaired sleep, appetite, and energy. *Id.* Leah F. Barahona, M.D. ("Dr. Barahona"), assessed "down" mood, constricted affect, fair insight and judgment, and otherwise normal findings

on MSE. Tr. at 1976–77. She provided Plaintiff information about the Vet Center in Myrtle Beach for therapy and indicated Plaintiff would be scheduled for follow up with a new psychiatrist. Tr. at 1977.

Plaintiff reported weight gain during a gastroenterology follow-up on April 13, 2018. Tr. at 1963. She indicated she performed exercise, including sit-ups, push-ups, walking, and jumping rope, each morning, but often turned to food for comfort. *Id.* She endorsed problems with sleep and indicated she had not been seen by mental health since February, was not scheduled for a visit until May, and felt she needed monthly treatment. Tr. at 1963, 1968. PA Bryan added Ducosate for constipation and instructed Plaintiff to increase her use of Preparation H suppositories. Tr. at 1968. She alerted the MOVE! coordinator that Plaintiff was interested in the weight loss program and the mental health department that she was interested in more frequent appointments. *Id.*

On May 17, 2018, Plaintiff complained of burning bilateral knee pain that was worsened by ascending stairs. Tr. at 1943. She reported nonsteroidal anti-inflammatory drugs ("NSAIDs") had provided no relief and she had discontinued physical therapy because it increased her pain. *Id.* Dr. Mazzochetti recorded unremarkable findings on exam, aside from bilateral knee crepitus. Tr. at 1944–45. He ordered x-rays of Plaintiff's bilateral knees,

discontinued Sulindac, and started ibuprofen 800 mg three times a day. Tr. at 1945.

Plaintiff also participated in a telehealth visit with psychiatrist Katherine S. Smith, D.O. ("Dr. Smith"), on May 17, 2018. Tr. at 1951. She reported fair sleep, denied psychosis, and admitted to alcohol and marijuana use. Tr. at 1951–52. Dr. Smith recorded the following on MSE: neat, clean, and casual appearance, grooming, and hygiene; uncooperative behavior; loud, rapid, and yelling speech; irritable mood and affect; normal thought content; denied hallucinations and delusions; thought process characterized by rapid rate of thoughts, yelling, and ruminating over marijuana; intact associations; intact memory and orientation; distracted concentration; average fund of knowledge; normal language; and limited judgment and insight. Tr. at 1952. She noted Plaintiff had been under the impression that the visit was one for therapy, was upset by the mention of her heavy marijuana use, did not want to quit using marijuana, and said she had no interest in medications because they did not work. Tr. at 1954.

On July 13, 2018, Plaintiff reported losing nine pounds over the prior two months due to following a keto diet. Tr. at 1925. She said she felt well and had good energy. *Id.* PA Bryan noted prominent xiphoid process that was mildly tender with palpation. Tr. at 1927. She initiated Lactulose twice a day and Ducosate at bedtime. Tr. at 1928.

On August 10, 2018, Plaintiff reported going to bed at 8:00 PM and waking at 2:30 AM. Tr. at 1916. She said her mind raced and her brain was like a derailed train. *Id.* She noted her house was her comfort zone and she only left it once a month to shop for groceries. *Id.* She endorsed distressing beliefs that everyone was taking advantage of her. Tr. at 1917. She indicated her activities of daily living ("ADLs") included watching television, playing on her phone, and smoking marijuana multiple times daily. *Id.* She said she lived with and assisted her grandparents, who both had dementia. *Id.* She said she had a few close friends, but was otherwise isolated. *Id.* Sandra M. Coulon, Ph.D. ("Dr. Coulon"), recorded mostly normal observations on MSE, but indicated Plaintiff had tense mood, congruent affect, and fair insight and judgment. Tr. at 1919–20.

On October 12, 2018, Plaintiff described feeling constantly bloated and as if someone were punching her in the stomach or as if her stomach were in knots. Tr. at 1905. She complained of chronic problems with straining and hemorrhoids and epigastric discomfort. *Id.* PA Bryan noted prominent xiphoid process mildly tender with palpation and mild abdominal distension. Tr. at 1907–08. She restarted Lubiprostone 24 mcg twice a day, in addition to 34.4 mg of Sennosides twice a day. Tr. at 1912. She ordered an ultrasound of Plaintiff's xiphoid process and her right upper quadrant. *Id.*

Plaintiff underwent a compensation and pension ("C&P") exam for back conditions on October 31, 2018. Tr. at 726. She complained of increasing back pain and spasms over the prior four to five months. Tr. at 727. She described a pulling sensation, pain along the paraspinal muscles, and occasional shooting pain down her bilateral thighs. *Id.* Margaret M. Grant, M.D. ("Dr. Grant"), noted a diagnosis of lumbosacral strain. *Id.* She recorded forward flexion as 70/90 degrees and extension as 25/30 degrees. Tr. at 728. She noted normal ROM on bilateral lateral flexion and rotation testing. *Id.* She stated Plaintiff had no additional loss of functional ROM after three repetitions. *Id.* She recorded 5/5 muscle strength throughout the bilateral lower extremities, no muscle atrophy, hypoactive deep tendon reflexes ("DTRs") at the bilateral knees, normal DTRs at the bilateral ankles, normal sensation throughout the bilateral lower extremities, negative bilateral straight-leg raise ("SLR"), no radicular pain, no ankylosis of the spine, no neurologic abnormalities, and no use of an assistive device for ambulation. Tr. at 730–32.

Dr. Grant also assessed Plaintiff's knee and lower leg conditions. Tr. at 734. She recognized diagnoses of bilateral knee instability and patellofemoral pain syndrome. Tr. at 735. Plaintiff complained her knees "hurt all the time," popped, burned, and felt as if they were grinding and separating. Tr. at 736. Dr. Grant observed right knee crepitus, right knee flexion and extension to 125/140 degrees, and left knee flexion and extension to 130/140 degrees. Tr.

at 736–37. She noted no additional functional loss of ROM on repetitive testing. Tr. at 737. She found 5/5 muscle strength throughout the lower extremities, no muscle atrophy, no ankylosis, and no evidence of joint instability. Tr. at 739–42.

On November 1, 2018, an ultrasound of Plaintiff's right upper quadrant, gallbladder, biliary tract, and pancreas was normal. Tr. at 855–56.

During a telemental health session on November 5, 2018, Plaintiff complained her PTSD was "very symptomatic" and had led to interpersonal difficulties with others and increased isolation. Tr. at 1880–81. She reported grieving over her father's death in August and experiencing intrusive memories of sexual trauma. Tr. at 1881. She said she engaged in some self-injurious behavior, including cutting herself "to relieve the pressure." *Id.* Dr. Coulon noted Plaintiff demonstrated and "to some degree acknowledge[d] strong tendencies toward all-or-none thinking when it comes to trusting others, with frequent decisions to isolate or end relationships rather than risk betrayal or experiencing the urge to hurt the other person." *Id.* She indicated Plaintiff further experienced violent, reactive ideations when she felt threatened by others. *Id.* She noted tense mood, congruent affect, fair insight and judgment, and otherwise normal findings on MSE. Tr. at 1884. She indicated Plaintiff agreed to home-based telemental health psychotherapy and referred her to psychiatrist Joseph C. Cheng, M.D. ("Dr. Cheng"). *Id.*

16

Plaintiff participated in a telemental health intake visit with Dr. Cheng on December 5, 2018. Tr. at 1850. She reported psychiatric diagnoses of PTSD associated with military sexual trauma, depression, and marijuana-use disorder and medical diagnoses of migraine and arthritis. Tr. at 1850. She sought to "get her mind under control and sleep peacefully." *Id.* She endorsed "real bad anger issues" and "bad connection/social issues." *Id.* She said she often woke at 2:00 AM and cried unnecessarily. *Id.* She indicated she had participated in therapy for eight years and it had been ineffective. *Id.* She reported smoking three marijuana joints a day and drinking three alcoholic drinks once a week. Tr. at 1852, 1854. She endorsed PTSD symptoms that included a history of childhood physical and sexual abuse and sexual assault while enlisted in the military, intrusive thoughts three to four times a day, trauma-related nightmares two nights per month, psychological distress at reminders of trauma, avoidance of thinking and talking about past trauma, avoidance of crowds and loud areas, distancing from others, restricted affect, irritability, hypervigilance, and exaggerated startle. Tr. at 1853. Dr. Cheng observed the following on MSE: well-groomed and dressed appropriate for the season; calm, cooperative, and appropriate behavior with good eye contact and no psychomotor agitation or retardation; alert and oriented times three; grossly intact attention span and concentration; language within normal limits; average fund of knowledge; regular rate, rhythm, and volume of

speech; "down" mood; constricted affect; logical, linear, and goal-directed thought processes; intact associations; grossly intact cognitions for recent and remote events; limited insight; and intact judgment. Tr. at 1857. He noted interactive complexity due to Plaintiff's hostility for prescribers. Tr. at 1868. He implemented a supportive approach to treatment and noted Plaintiff's response was initially guarded and defensive, but progressively receptive and appropriate. *Id.*

On December 13, 2018, Plaintiff reported some effect from her medication, but indicated she smoked marijuana prior to taking it because she felt anxious. Tr. at 1843. She denied smoking marijuana to get high and indicated she used it for "balance." *Id.* She indicated she could not work because her temper was "so bad," she was afraid she would "blow up." *Id.* She reported when she last worked, she had blacked out and attacked a student who called her a profane name. *Id.* Dr. Cheng recorded normal findings on MSE, aside from dysthymic mood, constricted and ornery affect, and limited insight. Tr. at 1846–47. He continued Tegretol and Hydroxyzine and encouraged Plaintiff to monitor her marijuana use. Tr. at 1847.

On December 19, 2018, Plaintiff reported she experienced a panic attack outside McDonald's after staff gave her an incorrect order, as well as a similar incident in line at Food Lion. Tr. at 1835–36. She felt that Tegretol was "dulling her anxiety superficially," such that it was just "tak[ing] the

edge off." Tr. at 1836. She admitted she often self-medicated with marijuana. *Id.* She indicated therapy had worsened her symptoms. *Id.* During the telemedicine visit, Dr. Cheng observed Plaintiff to be "sitting in what appears to be a closet," to have dysthymic and irritable mood, to show constricted and ornery affect, to have limited insight, and to have normal eye contact, orientation, attention span, concentration, language, fund of knowledge, speech, thought processes, associations, thought content, cognitions, and judgment. Tr. at 1839.

Plaintiff presented to Urgent Care for assessment of back pain on December 31, 2018. Tr. at 1827. She described a tight, knot-like, burning sensation from her bra strap area to her lower back. *Id.* She said it had been ongoing since October 31 and was exacerbated by position changes. *Id.* She denied lower extremity weakness, numbness, and paresthesia. *Id.* Amy Metcalf, M.D., observed bilateral lower lumbar muscular tenderness with palpation, but normal ROM of the back, negative bilateral SLR, normal gait, 5/5 motor strength, intact sensation, and no vertebral point tenderness, step-offs, or crepitus. Tr. at 1829. She assessed chronic low back pain and advised Plaintiff to continue to take her NSAID. Tr. at 1830.

On January 9, 2019, Plaintiff reported she was irate with the examiner who downgraded her service-connected disability rating for back and leg issues. Tr. at 1814. She complained of chronic back pain that radiated from

her groin to her toes and indicated her symptoms were exacerbated by the last C&P exam. *Id.* She said the evaluator caused her to flash back to episodes of sexual abuse. *Id.* During the telemedicine visit, Dr. Cheng observed Plaintiff to be sitting in what appeared to be a closet, to have dysthymic and irritable mood, to show constricted and ornery affect, and to demonstrate limited insight. Tr. at 1817. He noted other normal findings. *Id.* He prescribed Flexeril 10 mg three times a day for muscle spasms, increased Tegretol to 400 mg twice a day, continued Hydroxyzine as needed, and instructed Plaintiff to monitor her marijuana use. Tr. at 1818.

On January 14, 2019, Plaintiff complained of low back pain and inability to sit for any significant period. Tr. at 1807. She described pain that radiated down her bilateral legs and into her feet. Tr. at 1808. Dr. Mazzochetti observed palpable paravertebral muscle spasm, greater on the right than the left. Tr. at 1810. He noted limited active ROM to forward bending, rotation, and backward bending, antalgic gait, good side bending, negative heel and toe walking, and normal DTRs. *Id.* He discontinued ibuprofen and Flexeril and prescribed Diclofenac 75 mg twice a day and Baclofen 5 mg three times a day for muscle spasms. *Id.* He ordered x-rays of the lumbar spine and instructed Plaintiff to apply warm compresses several times a day. *Id.*

On January 18, 2019, Plaintiff complained Flexeril was not helping her back spasms and was making her feel sleepy and nauseated. Tr. at 1798. She stated her primary care physician had stopped ibuprofen and Flexeril and prescribed Diclofenac and Baclofen, causing her to feel "high" and unable to focus. *Id.* She reported Tegretol was slowing down her thoughts "in a good way" and slowing her rage "a little." *Id.* She described an episode the prior week during which her heart was aching and racing and she blacked out. Tr. at 1799. She said she typically woke between 2:00 and 3:00 AM with her mind racing. *Id.* She noted she had previously cut herself to pull her mind out of racing. *Id.* Dr. Cheng observed dysthymic and irritable mood, constricted and ornery affect, and limited insight, aside from other normal findings on MSE. Tr. at 1804. He indicated Plaintiff's PTSD was unstable and she was unwilling to engage in prolonged exposure therapy due to concerns over symptom exacerbation. Tr. at 1805. He described Plaintiff's unspecified mood disorder as unstable, as characterized by high highs, "down downs," and rapid cycling/high volatility and lability. *Id.* He indicated Plaintiff's chronic back and knee pain was an aggravating factor. *Id.* He stated Plaintiff's mood goal was to establish better calm and balance—not to pursue normalcy or happiness. *Id.* He indicated Plaintiff reported her medications caused numbness and that marijuana brought her back to life. *Id.* He prescribed Doxazosin 4 mg at bedtime for PTSD and continued Tegretol. *Id.*

Plaintiff followed up for chronic constipation and straining/hemorrhoids on January 23, 2019. Tr. at 1793. PA Bryan authorized another trial of Lubiprostone 24 mcg twice a day, magnesium oxide 420 mg twice a day, and Lactulose as needed. Tr. at 1796. She referred Plaintiff to colorectal surgery to discuss hemorrhoidectomy, but did not recommend it prior to improvement of her constipation. *Id.*

Plaintiff complained of feeling poorly on February 19, 2019. Tr. at 1779. She stated she was not sleeping well, overeating, only attending to her hygiene once every three or four days, anhedonic, and had no energy. *Id.* She said she was experiencing severe tension headaches due to anxiety. *Id.* Dr. Cheng indicated Plaintiff became tearful when discussing recent and upcoming appointments. *Id.* He noted the interaction was characterized by highly-affective presentation, mood lability, and moderate difficulty in redirection. *Id.* However, he recorded normal findings on MSE, aside from dysthymic and irritable mood, constricted and ornery affect, and limited insight. Tr. at 1779–80. He prescribed Quetiapine 100 mg at bedtime for mood and insomnia and continued Plaintiff's other medications. Tr. at 1780.

On February 27, 2019, an MRI of Plaintiff's lumbar spine was mostly normal, showing only mild loss of height of the L5–S1 intervertebral disc, a tiny synovial cyst on the left at the L3–4 level, minimal annular bulging at

L4–5, with only minor compromise of the left L4 neural foramen, and partial sacralization of the L5 vertebral body. Tr. at 853–54.

Plaintiff presented for a general surgery consultation as to hemorrhoids on March 6, 2019. Tr. at 1767. She reported prior hemorrhoidectomy in 2005 while she was stationed in Korea. *Id.* She endorsed pain, itching, and swelling. *Id.* Physician assistant Emily Couture noted external and internal hemorrhoids and skin irritation. Tr. at 1773. She recommended supportive therapy for Plaintiff's skin irritation prior to considering further hemorrhoid surgery. *Id.*

On March 13, 2019, Plaintiff reported she was taking things a day at a time. Tr. at 1758. She stated she woke, showered, and visited the mall for 10 minutes earlier in the day and noted it was the first time in two weeks she had left her home, except for appointments. *Id.* She indicated she had been researching borderline personality disorder, and Dr. Cheng suggested the diagnosis was inappropriate. *Id.* Plaintiff noted her stress and anxiety were reduced to a four with her medication, but she had continued difficulty falling asleep. *Id.* Dr. Cheng described Plaintiff as having dysthymic and irritable mood, constricted and ornery affect, and limited insight, but otherwise recorded normal findings on MSE. Tr. at 1759.

Dr. Cheng observed Plaintiff to be more energetic and to demonstrate fuller and brighter affect on March 27, 2019. Tr. at 1739. He noted Plaintiff

continued to be hampered by knee pain and demonstrated limping and non-weight bearing gait. *Id.* He indicated Plaintiff continued to read the Bible and information about PTSD, but was not amenable to group or other treatment. Tr. at 1740. Plaintiff reported her medications were providing 30% improvement and she was putting in an additional 20%. *Id.* Dr. Cheng continued Plaintiff's medications. Tr. at 1741.

Plaintiff presented to Conway Medical Center for right knee pain on March 20, 2019. Tr. at 533. X-rays were unremarkable. Tr. at 536. John Allen Rogowski, Jr., M.D., noted specific tenderness to the right lateral knee, somewhat limited ROM, and warmth. Tr. at 540. He fitted Plaintiff for a knee immobilizer and crutches, instructed her to continue NSAIDs, and advised her to follow up with an orthopedic practice or the Veterans Administration Medical Center ("VAMC"). *Id.*

Plaintiff presented for a C&P exam for back conditions on April 30, 2019. Tr. at 701. Randall P. Grove, M.D. ("Dr. Grove"), noted Plaintiff's diagnoses included lumbosacral strain and lumbar region radiculitis. Tr. at 702. Plaintiff described low back pain associated with pain, stiffness, spasms, fatigability, weakness, numbness, and tingling in the buttocks and legs. Tr. at 703. She endorsed pain and difficulty with ADLs, lifting and carrying gear and equipment, bending over, and standing, walking, and sitting for prolonged periods. Tr. at 704. Dr. Grove observed abnormal ROM with 45/90

degrees forward flexion, 10/30 degrees extension, 15/30 degrees right lateral flexion and rotation, and 15/30 degrees left lateral flexion and rotation. *Id.* He noted moderate tenderness over Plaintiff's lumbar paraspinal area. Tr. at 705. He recorded reduced ROM after three repetitions. *Id.* He noted Plaintiff had mild-to-moderate spasm in the lumbar paraspinal area. Tr. at 706. He indicated Plaintiff had disturbance of locomotion and interference with sitting and standing. Tr. at 707. He noted 5/5 strength to bilateral hip flexion, knee extension, ankle plantar flexion, ankle dorsiflexion, and great toe extension. *Id.* He stated Plaintiff had no muscle atrophy. *Id.* He rated normal 2+ bilateral knee and ankle DTRs. Tr. at 708. He recorded normal sensation to light touch throughout Plaintiff's bilateral lower extremities. *Id.* He found negative bilateral SLR. *Id.* He noted mild intermittent bilateral lower extremity radicular pain and paresthesia or dysesthesia. Tr. at 709. He indicated involvement of Plaintiff's L4, L5, S1, S2, and S3 nerve roots with mild bilateral radiculopathy. *Id.* He denied that Plaintiff used an assistive device as a normal mode of locomotion. Tr. at 709–10. He stated Plaintiff had no evidence of nerve root encroachment to support a diagnosis of radiculopathy. Tr. at 713. He wrote: "In my opinion, the Veteran's current condition (Radiculitis, lumbar region) is a progression of the Veteran's [service connected] condition (Lumbosacral Strain)." *Id.*

Dr. Grove also evaluated Plaintiff for knee and lower leg conditions. Tr. at 713. He stated Plaintiff's diagnoses included bilateral knee instability and bilateral patellofemoral pain syndrome. Tr. at 714. Plaintiff endorsed constant pain, weakness, stiffness, swelling, fatigability, and lack of endurance. Tr. at 714–15. She reported knee pain caused difficulty with ADLs and standing and walking for prolonged periods. Tr. at 716. Dr. Grove observed reduced flexion and extension to 75/140 degrees, moderate tenderness with palpation of the joint, and objective evidence of crepitus on examination of the bilateral knees. Tr. at 716–17. He noted additional functional loss of ROM following repetitions. Tr. at 717–18. He recorded normal muscle strength, no muscle atrophy, and no ankylosis. Tr. at 720–21. He noted testing showed no evidence of joint instability. Tr. at 721–23.

On May 22, 2019, Plaintiff reported her grandfather had passed away approximately one month prior. Tr. at 1119. She said the stress was causing pain in her stomach and achiness in her bones. *Id.* Dr. Cheng noted Plaintiff was using food and soda for solace and encouraged her to cut back on her soda consumption. *Id.* He observed dysthymic mood, constricted affect, and limited insight on MSE, but all other findings were intact. *Id.* He prescribed Bupropion 75 mg and Naltrexone 25 mg and continued Plaintiff's other medications. Tr. at 1120.

Plaintiff complained of an acute exacerbation of chronic low back pain on May 24, 2019. Tr. at 1107. She also reported chronic bilateral knee pain and swelling in her left foot. *Id.* Ginia Pierre, M.D. ("Dr. Pierre"), observed Plaintiff to be walking with a cane, to have minimal edema in her lateral malleolus, to demonstrate decreased ROM in her knees, and to be tender to light touch in her bilateral joint spaces and over her spine and paraspinal muscles. Tr. at 1113. She referred Plaintiff for a pain management consultation and provided information on an anti-inflammatory diet. Tr. at 1114.

On June 12, 2019, an MSE was normal, aside from dysthymic mood, constricted affect, and limited insight. Tr. at 1098–99. Dr. Cheng continued Plaintiff's medications. Tr. at 1099–1100.

Plaintiff presented for gastroenterology follow up on June 21, 2019. Tr. at 1094. She reported her chronic constipation was controlled by Lubiprostone and Lactulose and her nausea was resolved by taking Lubiprostone with food. *Id.* She noted gastroesophageal reflux disease ("GERD") was improved with Omeprazole and Gaviscon. *Id.* She endorsed intentional weight loss through use of Wellbutrin and Naltrexone. *Id.* She said she experienced occasional rectal bleeding due to hemorrhoids. Tr. at 1094–95. PA Bryan recorded normal findings on physical exam. Tr. at 1095–

27

96. She increased the quantity of Lactulose to prevent Plaintiff from running out and continued her other medications. Tr. at 1096–97.

Plaintiff reported "good" and "bad" days on June 26, 2019. Tr. at 1083. She endorsed difficulty sleeping due to her mind racing and being awakened by nightmares. *Id.* She said she would typically nap for two to three hours during the day and had slept throughout the prior day because she had not slept well on the seven prior nights. *Id.* She indicated she had attempted to volunteer with children, but had returned to her home because she could not tolerate the environment. *Id.* She complained of stomach pain and migraines. *Id.* Dr. Cheng noted normal orientation, attention span, concentration, language, fund of knowledge, speech, thought processes, associations, thought content, cognitions, and judgment on MSE. Tr. at 1083–84. He indicated Plaintiff's mood was dysthymic, her insight was limited, and her affect was constricted, but fuller. *Id.* He increased Quetiapine to 50 mg in the morning and 200 mg in the evening and continued her other medications. Tr. at 1085.

Plaintiff presented to PT Anama for a physical therapy consultation on July 10, 2019. Tr. at 660. PT Anama observed Plaintiff to ambulate with "HEAVY ANTALGIC GAIT W RIGHT HANDED ST CANE IN SEQUENCE W RIGHT LE." *Id.* He fitted Plaintiff with bilateral knee sleeves and a lumbosacral support and instructed her on proper use of a cane. *Id.*

On July 12, 2019, Plaintiff presented to Robert S. Friedman, M.D. ("Dr. Friedman"), for a pain assessment. Tr. at 665. She reported "nightmares about dead people" and indicated she had difficulty sleeping due to PTSD and worsening back pain. *Id.* She indicated she was taking a lot of Fioricet for headaches. *Id.* She rated her usual pain as an eight on a 10-point scale. *Id.* Dr. Friedman administered acupuncture treatment. Tr. at 672.

On July 19, 2019, Plaintiff reported struggling with the recent loss of her dog. Tr. at 1043. She described poor appetite, overeating at times, feeling groggy, not sleeping, numbness, bad dreams, and stomach pain. Tr. at 1043–44. Dr. Cheng recorded normal findings on MSE, aside from dysthymic mood, constricted affect, and limited insight. Tr. at 1044. He continued Plaintiff's other medications, discontinued Tegretol 400 mg, and prescribed Topiramate 25 mg for mood stability, headache, chronic pain, and weight control. Tr. at 1045.

On August 14, 2019, Plaintiff reported struggling with her aunt's recent death and the one-year anniversary of her father's death. Tr. at 1023. She said her knees gave out the prior day, causing her to fall and injure her elbows. *Id.* She indicated Quetiapine was no longer helping her to sleep. *Id.* She said she was only eating once a day and her emotions were on a roller coaster. *Id.* She noted she was experiencing breakthrough headaches, despite use of Topiramate. *Id.* Dr. Cheng noted normal findings on MSE, except for

dysthymic mood, constricted affect, and limited insight. *Id.* He instructed Plaintiff to stop Topiramate, Quetiapine, and Doxazosin, to start Haloperidol 1 mg twice a day as needed, and to continue Bupropion 75 mg and Hydroxyzine. Tr. at 1024.

Plaintiff complained of significant family conflict on September 4, 2019. Tr. at 1011. She stated she was providing care to her grandmother. *Id.* She said she felt as if she might hurt someone, but identified no specific target for violence. *Id.* Dr. Cheng recorded normal findings on MSE, except for dysthymic mood, constricted affect, and limited insight. Tr. at 1012. He increased Naltrexone from 25 mg to 50 mg and Haldol to 2 mg. Tr. at 1011.

On September 25, 2019, Plaintiff reported frequent pain in her knee and the back of her leg and indicated her legs had been giving out. Tr. at 1002. She denied side effects from increased doses of Haloperidol and Naltrexone. *Id.* Dr. Cheng noted normal findings on MSE, aside from limited insight, dysthymic mood, and constricted affect. Tr. at 1002–03. He changed Bupropion to the extended-release formula. Tr. at 1002.

Plaintiff reported "doing a little better" on October 10, 2019. Tr. at 673. She complained of knee pain and some episodes of her knees giving way. *Id.* She endorsed poor sleep, mood swings, and paranoia. *Id.* She indicated she was participating in water therapy, receiving acupuncture, following a Keto diet, attending mental health visits, and burning sage to help her symptoms.

*Id.* Dr. Friedman recommended Plaintiff continue aromatherapy, use a Theracane trigger point massager, decrease her fat intake, increase her protein and vegetable consumption, apply a heating pad to her abdomen for irritable bowel syndrome ("IBS") symptoms, and follow up with her mental health provider for worsening anxiety. Tr. at 680.

On October 23, 2019, Plaintiff complained of worsened paranoia on Bupropion XL. Tr. at 977. She reported decreased energy, moderate restlessness, checking behind her back more often, and seeing intermittent black shapes. Tr. at 978. She endorsed little improvement with water aerobics, but agreed to complete the program. *Id.* She said she was eating only once a day and experiencing crying episodes. *Id.* She reported low back pain and two migraines during the prior month. *Id.* Dr. Cheng recorded mostly normal findings on MSE, except for dysthymic mood, limited insight, and constricted, but fuller affect. *Id.* He started Duloxetine 20 mg at bedtime, decreased Bupropion to 75 mg daily, and continued Haloperidol and Naltrexone. Tr. at 979.

Plaintiff followed up for constipation and epigastric pain on October 29, 2019. Tr. at 968. She reported her current medication routine was effectively addressing her symptoms. *Id.* PA Bryan recorded normal findings on physical exam. Tr. at 969. She continued Plaintiff's medications. Tr. at 970.

1:21-cv-02249-SVH    Date Filed 02/22/22    Entry Number 32    Page 32 of 78

During a telephone encounter with Dr. Cheng on November 14, 2019, Plaintiff complained of worsened back pain and a headache that lasted for three days during the prior week. Tr. at 847. She reported acupuncture released some of the pressure she was feeling and use of marijuana after three days abstinence released the remainder of the pressure. *Id.* She said she typically awoke with 10 thoughts racing through her head and could reduce them by three by taking medication and another three by using marijuana. *Id.* She reported biting her nails and grinding her teeth and biting the inside of her mouth during sleep. *Id.* She claimed she attended a job interview at Walmart the prior week, but started crying and "fell apart" as soon as she arrived for it. *Id.* She said she was unable to deal with people or a job. *Id.* Dr. Cheng indicated he planned to increase Duloxetine to 40 mg and stop Bupropion. Tr. at 848.

On December 11, 2019, Plaintiff reported receiving acupuncture treatment without improvement. Tr. at 837. *Id.* She endorsed decreased energy and depressive symptoms following the death of her dog, but indicated she had been volunteering as a tutor. *Id.* Dr. Cheng observed normal orientation, attention span, language, fund of knowledge, speech, thought process, associations, thought content, cognitions, and judgment. Tr. at 838. He noted Plaintiff's limited insight, dysthymic mood, and constricted, but

fuller, affect. *Id.* He increased Duloxetine and continued Plaintiff's other medications. Tr. at 839.

Plaintiff reported more good-than-bad weeks during a mental health visit on January 8, 2020. Tr. at 828. She stated her grandmother had been admitted to the hospital that day. *Id.* She said she felt very tired over the prior week. *Id.* She noted she had recently adopted a 12-week-old puppy and moved into a new mobile home with her brother. *Id.* She indicated she was continuing to read to children at the elementary school. *Id.* She denied receiving recent acupuncture treatment, as she could not afford the gas for the twice-weekly trips and had not received reimbursement from the VA for her prior travel costs. *Id.* She said she was experiencing three good weeks per month, but her PTSD symptoms continued to be stronger at night and cycles of increased symptoms occurred unpredictably. *Id.* Dr. Cheng recorded mostly normal findings on MSE, except that Plaintiff had dysthymic mood, limited insight, and constricted, but fuller affect. *Id.* He continued Plaintiff's medications. Tr. at 829.

On January 15, 2020, Dr. Cheng wrote a letter expressing his support for Plaintiff's effort to obtain disability benefits. Tr. at 578. He represented he had been working with Plaintiff at least once a month since December 5, 2018. *Id.* He explained he provided medication management and psychotherapy for treatment of PTSD. *Id.* He stated Plaintiff's progress was

limited and her prognosis was guarded, despite her engagement and adherence to the treatment plan. *Id.* He identified Plaintiff's symptoms as intrusive thoughts/memories, flashback nightmares, avoidance of public areas, hypervigilance, hyperstartle, and severely-impacted cognitive patterns and emotional regulation. *Id.* He indicated Plaintiff had tried numerous psychotropic medications, but her PTSD symptoms had remained largely refractory to medication alone. *Id.* He further explained supportive therapy had produced modest, positive shifts in Plaintiff's self-care, but she remained "far from able to overcome her chronic PTSD symptoms in order to find and sustain gainful employment." *Id.*

Plaintiff reported chronic constipation, hemorrhoids, and periodic episodes of abdominal pain on January 21, 2020. Tr. at 807. Her blood pressure was elevated at 144/81 mmHg, but a physical exam was otherwise normal. Tr. at 811–12. Physician assistant Jami Auslander continued the same treatment for constipation and hemorrhoids and instructed Plaintiff to decrease Omeprazole to 20 mg twice a day and continue dietary and lifestyle changes to address epigastric pain. Tr. at 812.

Plaintiff presented for a psychosocial assessment the same day. Tr. at 821. She endorsed chronic low back pain, bilateral knee pain, abdominal pain/IBS, and headaches. Tr. at 822. Layne A. Goble, Ph.D. ("Dr. Goble"), noted Plaintiff's pain behaviors included slower and antalgic gait, difficulty

standing from a seated position, and reported anxiety related to PTSD. *Id.* Plaintiff rated her pain as a seven during the visit and ranging from a seven to an eight over the prior 24-hour period. *Id.* On a 10-point scale with zero representing "does not interfere" and 10 representing "completely interferes," Plaintiff rated interference with general activity as an eight, mood as a 10, walking ability as a six, normal work (including inside and outside the home) as a 10, relation with other people as a nine, sleep as a 10, and enjoyment of life as a six. Tr. at 822–23. She described her pain as tiring/exhausting, fearful, throbbing, shooting, stabbing, sharp, gnawing, hot/burning, aching, heavy, tender, and splitting. Tr. at 823. She endorsed difficulty falling asleep and significant sleep disturbance mostly due to anxiety and PTSD. *Id.* She said she slept an average of five to six hours during the night and denied daytime napping. *Id.* She reported difficulty standing for more than 30 minutes, driving, bending over, using stairs, standing from a seated position, and engaging in prolonged walking. *Id.* She endorsed significant daily emotional interference and isolative behavior due to PTSD and depressive symptoms. Tr. at 824. Plaintiff reported smoking marijuana daily to help with her mood. *Id.* She indicated she had strong social support from her immediate family and several close friends and attended her local church. *Id.* Dr. Goble noted mostly normal findings on MSE, except that Plaintiff's mood was "[d]ifficult," her judgment and insight were fair, and her affect was

anxious, although her anxiety lessened as the interview progressed and they developed a rapport. Tr. at 825. His clinical impressions were somatic symptom disorder, PTSD, MDD versus bipolar affective disorder, insomnia disorder versus PTSD-induced insomnia disorder, rule out obstructive sleep apnea ("OSA"), and rule out marijuana use disorder. Tr. at 826. He recommended follow up with the Pain Psychology Clinic, continued work with Dr. Friedman for medical management of chronic pain, continued mental health services with Dr. Cheng, and consultation for a sleep study. *Id.* He noted Plaintiff expressed interest in engaging in cognitive behavioral therapy ("CBT") for chronic pain. Tr. at 827.

Plaintiff also met with Dr. Friedman. Tr. at 815. She reported she "just had a panic attack" and was experiencing increased stress due to the deaths of multiple people in her life. *Id.* However, she stated she was "giving back" by helping at-risk students at the high school and reading to elementary school children. *Id.* She complained of some right knee pain and was uncertain as to whether treatment was benefitting her back pain. *Id.* Dr. Friedman treated Plaintiff with pressure-point magnets and encouraged her to use breathing exercises, trial of magnets, acupuncture, stomach massage with heat, and a heat lamp. Tr. at 820–21.

Plaintiff complained of worsened knee pain on January 29, 2020. Tr. at 797. She reported her grandmother was hospitalized and she was visiting her

daily. *Id.* She noted she had recently started dating a man she met through a mentoring program. Tr. at 797–98. Dr. Cheng spoke with Plaintiff about a pain psychology encounter in which she felt pushed to engage in trauma-focused therapy. Tr. at 798. Plaintiff was adamant that she did not want to pursue trauma-focused therapy. *Id.* Dr. Cheng assessed fair insight and judgment and otherwise noted normal findings on MSE. *Id.* He continued Plaintiff's medications. Tr. at 799.

Plaintiff presented to Leslie Jafarace for acupuncture treatment on February 11, 18, and 28, May 14, 21, and 28, and June 19. Tr. at 1162–75. She noted she was serving as her grandmother's primary caregiver. Tr. at 1168.

On February 12, 2020, Plaintiff reported doing well, being social, and recently going on a date. Tr. at 787. She indicated her new dog was an excellent companion and kept her occupied and motivated. *Id.* She stated she recently spoke to a group of fifth and sixth graders about bullying. Tr. at 788. She noted the organizers of the event had requested she speak at other events. *Id.* She indicated she was pleased with her new massage therapist and was receiving good response for her back pain. *Id.* Dr. Cheng noted fair insight and judgment and normal findings on MSE. *Id.* He continued Plaintiff's medications. Tr. at 789.

Plaintiff underwent a sleep study on April 3, 2020. Tr. at 624–26. It did not reveal significant sleep-disordered breathing, but indicated overall sleep efficiency of only 64%. Tr. at 625, 626.

During a mental health telehealth visit on April 23, 2020, Plaintiff reported she had been "[s]tuck in [her] home for 41 days." Tr. at 771. She indicated she had initiated a new relationship, but was somewhat suspicious of the man's motivation. *Id.* Dr. Cheng recorded normal findings on MSE and described Plaintiff's insight and judgment as fair. Tr. at 772. He continued Plaintiff's medications. Tr. at 773.

On May 7, 2020, Plaintiff reported her pain completely interfered with her general activity, mood, normal work inside and outside her home, and sleep and frequently interfered with her walking ability, relationships with others, and enjoyment of life. Tr. at 769. Dr. Goble noted Plaintiff displayed a wide range of affect appropriate to the setting, was fully oriented, and demonstrated normal speech and appearance. *Id.* He recommended Plaintiff continue CBT for chronic pain, complete her pain self-management goals, and continue with mental health services. *Id.*

On May 29, 2020, Plaintiff reported increased anxiety due to her grandmother's hospitalization. Tr. at 759. She discussed conflict in her dating relationship. *Id.* Dr. Cheng noted fair insight and judgment and otherwise normal findings on MSE. *Id.* He continued Plaintiff's medications. Tr. at 760.

On June 18, 2020, Plaintiff rated her knee pain as a five. Tr. at 872. She reported using pressure magnets over her knee and other areas with benefit. *Id.* She stated she was benefitting from weekly acupuncture sessions. *Id.* She admitted she continued to use marijuana. *Id.* She said she had "lots of people in [her] head" and was unable to clear her mind with breathing exercises. *Id.* Dr. Friedman encouraged Plaintiff to continue to use breathing exercises, acupuncture, and yoga. Tr. at 873.

On June 26, 2020, Plaintiff reported feeling ill and tired and having no energy or appetite. Tr. at 745. She stated people were "getting on her nerves." *Id.* Dr. Cheng recorded fair insight and judgment and otherwise normal findings on MSE. *Id.* He continued Plaintiff's medications. Tr. at 746.

On July 16, 2020, state agency psychological consultant Blythe Farish-Ferrer, Ph.D. ("Dr. Farish-Ferrer"), reviewed the record and completed a psychiatric review technique ("PRT"), considering Listings 12.04 for depressive, bipolar, and related disorders and 12.06 for anxiety and obsessive-compulsive disorders. Tr. at 146–47. She assessed Plaintiff as having mild limitations in her abilities to understand, remember, or apply information and adapt or manage oneself and moderate limitations in her abilities to interact with others and concentrate, persist, or maintain pace. *Id.* Dr. Farish-Ferrer noted: "While it is concluded that cl[aimant]'s mental impairments are severe, these impairments are not expected to preclude the

performance of simple, repetitive work tasks in a setting that does not require on-going interaction with the public." Tr. at 147. She also completed a mental residual functional capacity ("RFC") assessment, indicating moderate limitations in Plaintiff's abilities to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or in proximity to others without being distracted by them, interact appropriately with the general public, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 151–53. She explained:

> Due to cl[aimant]'s mental p[roblems], this cl[aimant] may have difficulty attending to complex tasks, but should be able to attend to and perform simple tasks for two plus hours at a time without special supervision. She can attend work regularly, needing to miss no more than an occasional day due to her mental illness. She can accept supervision, but may not be suited for work with the general public. She can use public transportation, make work-related decisions, and protect herself from work-related safety hazards.

Tr. at 153. At the reconsideration level, a second state agency psychological consultant, Kendra Werden, Ph.D. ("Dr. Werden"), reviewed the record, completed a PRT considering the same listings, assessed the same limitations in each of the four areas of mental functioning, and indicated the same mental RFC as Dr. Farish-Ferrer. *Compare* Tr. at 146–47 *and* 151–53, *with* Tr. at 162–63 *and* 168–69.

On July 21, 2020, state agency medical consultant Sherrial Simmers, M.D. ("Dr. Simmers"), assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally kneel, crouch, crawl, and climb ramps or stairs; frequently balance and stoop; and avoid concentrated exposure to extreme cold, extreme heat, humidity, hazards, fumes, odors, dusts, gases, poor ventilation, and other respiratory irritants. Tr. at 148–51. A second state agency medical consultant, Isabella McCall, M.D., assessed the same physical RFC on October 13, 2020. *Compare* Tr. at 148–51, *with* Tr. at 165–67.

On July 24, 2020, Plaintiff complained of feeling tired, having negative thoughts, and being very sluggish. Tr. at 1411. She reported ceasing contact with her boyfriend. *Id.* Dr. Cheng noted fair insight and judgment and normal MSE findings. Tr. at 1411–12.

On August 7, 2020, Plaintiff reported the recent deaths of four family members, including an aunt who died of COVID. Tr. at 1403. She stated her grandmother's cancer had returned and was very aggressive. *Id.* She complained of increased back and neck pain, but was reluctant to pursue additional treatment because of increased risk of contracting COVID. *Id.* She

41

admitted she was smoking marijuana at night to stop her mind from racing and to reduce her pain. *Id.* Dr. Cheng recorded normal findings on MSE. *Id.* He continued Plaintiff's other medications and prescribed Cetirizine for allergic rhinitis and Gabapentin for pain, anxiety, relaxation, and marijuana reduction. Tr. at 1403, 1405.

Plaintiff rated her average pain as a five on August 28, 2020. Tr. at 1394. She endorsed increased stress due to COVID and washing her hands 20 times a day, although she was not leaving her house. *Id.* She said she was using breathing exercises and abstaining from alcohol. Tr. at 1395. She reported increased back pain, but indicated she had not attended acupuncture treatment. *Id.* Dr. Friedman discussed handwashing guidelines, provided a COVID packet, ordered an acupressure trial, and instructed Plaintiff to avoid television, continue use of moisturizers, and use visualization to assist in relaxation. *Id.*

On September 3, 2020, Plaintiff complained of overwhelming stress and migraines. Tr. at 1381. She indicated she was providing care to her grandmother. *Id.* She said she had difficulty dealing with the anniversary of her cousin's death, had "been in a funk" since July 17, and was eating for comfort. *Id.* Dr. Cheng noted Plaintiff was crying over the phone. *Id.* He stated he was unable to increase Plaintiff's dose of Bupropion to 150 mg because it would cause nausea, but instructed her to take 75 mg of Bupropion

twice a day. *Id.* He noted fair insight and judgment and otherwise normal findings on MSE. Tr. at 1381–82.

On October 1, 2020, Dr. Cheng noted his telehealth visit with Plaintiff was abbreviated because she did not want to talk openly and worry her grandmother. Tr. at 1188. Plaintiff reported increasing Bupropion to 75 mg twice a day had been helpful. *Id.* She admitted she had increased her marijuana smoking due to stress. *Id.* Dr. Cheng recorded normal findings on MSE, except that Plaintiff had fair insight and judgment. *Id.* He continued Plaintiff's medications. Tr. at 1189.

On October 16, 2020, Plaintiff reported she had been unable to visit her grandmother because someone in her nursing home had COVID. Tr. at 1250. She reported more frequent panic attacks and smoking marijuana three to six times a day to deal with anxiety related to frustration with family members. *Id.* Dr. Cheng continued Plaintiff's medications. Tr. at 1251.

Plaintiff rated her pain as a six on October 27, 2020. Tr. at 1342. She reported she had lost family members to COVID and felt frustrated by people around her in the grocery store and at appointments who refused to wear masks and socially distance. *Id.* She complained of difficulty sleeping, neck pain, headaches, and knee pain. *Id.* Dr. Friedman assessed fibromyalgia, insomnia, knee pain, PTSD, and marijuana abuse. Tr. at 1343. He instructed Plaintiff to use the Theracane in the car, to take breaks while driving to

reduce cervical pain, to use lavender for stress reduction, to continue CBT, to use sunglasses in the morning, and to try a sleep mask. *Id.*

On November 13, 2020, Plaintiff expressed frustration over her chronic problems and being denied Social Security disability benefits. Tr. at 1238. She said she wanted to volunteer to help children in school. *Id.* She reported waking with "5000" thoughts and smoking marijuana to be able to sleep. *Id.* She indicated she had cut herself off from family members other than her grandmother and felt irritable when she visited the grocery store. *Id.* Dr. Cheng noted Plaintiff's fair insight and judgment and otherwise recorded normal observations on MSE. *Id.* He continued Plaintiff's medications. Tr. at 1239.

Plaintiff did not feel like talking during her scheduled visit with Dr. Cheng on December 16, 2020. Tr. at 1323. She indicated she expected the visit would be rescheduled due to her grandmother's recent death. *Id.* Dr. Cheng described Plaintiff's insight and judgment as fair and recorded no abnormal findings on MSE. Tr. at 1323–24. He continued Plaintiff's medications. Tr. at 1325.

On January 22, 2021, Plaintiff reported she had enrolled in school for early childhood development and was attending classes on Wednesdays as a distraction from her grandmother's death. Tr. at 1314. She indicated she had cut off her family members because they had not allowed her to be with her

grandmother at the end of her life. *Id.* She said she was baking for herself and others as a distraction. *Id.* She reported she did not attend her grandmother's funeral because her family had treated her so poorly. Tr. at 1314–15. Dr. Cheng noted fair insight and judgment and normal findings as to other aspects of the MSE. Tr. at 1315. He continued Plaintiff's medications. Tr. at 1316.

     C.     The Administrative Proceedings

          1.     The Administrative Hearing

               a.     Plaintiff's Testimony

At the hearing, Plaintiff testified she lived alone, but had lived with her grandmother prior to her death on November 22, 2020. Tr. at 80. She stated she had cooked her grandmother's meals, kept the house clean, helped bathe her, administered her medications, transported her to doctors' appointments, and helped her with her ADLs. Tr. at 81.

Plaintiff said she was 5'5" tall and weighed 165 pounds. *Id.* She stated she had lost 23 pounds over the prior three years due to stress. Tr. at 81–82. She indicated she had last renewed a cosmetology license to teach on October 1, 2020. Tr. at 82. She noted she was required to take a couple of online classes to renew her license. Tr. at 83. She denied working for profit in the cosmetology field since 2016. *Id.* She stated she had renewed her cosmetology license because, if she were to maintain a license for 20 years, she would

become a master cosmetologist and be eligible to retire her license. Tr. at 84. Plaintiff confirmed she had served in the Army from 1999 to 2008. Tr. at 85. She said she worked as an administrative assistant throughout this period and received an honorable discharge. Tr. at 85–87. She denied collecting unemployment benefits after April 2016. Tr. at 87. She confirmed she had received a total and permanent disability rating from the Department of Veterans Affairs ("VA"), effective in January 2020. Tr. at 87–88. She noted she received about $3,500 per month in benefits from the VA and denied receiving any other monthly benefits. Tr. at 88–89. She denied working anywhere since April 2016. Tr. at 89.

Plaintiff testified she had last used marijuana six months prior. Tr. at 90. She stated she had previously smoked three marijuana cigarettes per day. *Id.* She said the marijuana made her symptoms better, as she felt more balanced. Tr. at 91. She denied using alcohol, except on a social basis. *Id.* She said she did not smoke cigarettes. *Id.*

Plaintiff stated she volunteered through a tutoring program for an hour to an hour-and-a-half on Wednesdays, mentoring and assisting children with their schoolwork. Tr. at 92. She noted she had been doing this work for about a year. Tr. at 93. She indicated she had completed a tutoring program through the YMCA in 2017. *Id.*

Plaintiff testified she had worked as a teacher at three beauty schools in 2012 and 2013. Tr. at 94–95. She said she worked as a cashier at Walmart for a couple months in 2011. Tr. at 95. She indicated she previously worked as a hair salon manager. Tr. at 96. She noted she also worked as a customer service representative for AT&T Mobility in 2008 and 2009. Tr. at 97.

Plaintiff said her mind prevented her from working because it moved "like a derailed train." Tr. at 98. She testified she could not focus. *Id.* She noted symptoms of PTSD would "shut [her] body down four days out [of] the week." *Id.* She said PTSD also affected her memory. Tr. at 99. She indicated her mind would not shut off. *Id.* She stated stress would "lock up [her] bowels," preventing her from going to the bathroom for a week or two at a time. *Id.*

Plaintiff testified her body felt tight and she had difficulty getting out of bed. *Id.* She said she experienced four bad days per week. Tr. at 100. She rated the impact of her mental health as beyond overwhelming, even on her better days. *Id.* She stated it was difficult for her to interview face-to-face because her PTSD symptoms caused her to shut down. Tr. at 101. She said it was easier for her to interact with children because they balanced her out. *Id.* She clarified she could perform volunteer work, as opposed to paid work, because she could not be fired if she blacked out or had an extreme emotional reaction due to her impairments. Tr. at 102.

Plaintiff testified her bowel and constipation issues made it uncomfortable for her to work in any position due to increased stomach pain. Tr. at 102–03. She rated this pain as a 15 on a 10-point scale. Tr. at 103. She confirmed her asthma was relieved by medication. *Id.* She said her hands and wrists often locked up. *Id.* She indicated her body "stay[ed] cold." Tr. at 104. She stated her knees would lock up if she drove over 30 minutes. *Id.* She rated her knee pain as a seven. Tr. at 106.

Plaintiff estimated she could stand for 30 to 45 minutes and would require a 20-minute rest break prior to standing again. *Id.* She said she only walked when necessary and did not engage in exercise due to achiness in her knees. *Id.* She estimated she could walk for 15 minutes and rest for 10 minutes prior to walking again. Tr. at 107. She stated her knee problems affected her ability to lift. *Id.*

Plaintiff said burning and achiness in her lower back caused difficulty bending over. Tr. at 108. She described it as feeling like a thorn. *Id.* She indicated her back pain also affected her ability to stand and walk. Tr. at 109. She said she spent most of the day lying down. *Id.* She testified she could sit for about an hour and a half. *Id.* She said that when she worked, she would get up and walk around for a few minutes before returning to a seated position. Tr. at 109–10. She stated the heaviest items she lifted were grocery

bags weighing about 10 pounds. Tr. at 110. She rated her low back pain as a seven. *Id.*

Plaintiff testified her typical day began at 2:30 AM, even if she had not fallen asleep until 11:00 PM. Tr. at 111. She said she would wake with her mind racing. *Id.* She confirmed she was able to care for her personal hygiene. *Id.* She said she experienced a period of "false energy" during which she would wash clothes, sweep the floor, and perform other household chores. *Id.* She indicated her energy decreased by 7:00 AM and she had no energy left by noon. *Id.* Said she would lie down for much of the remainder of the day. Tr. at 111–12. She stated she attended online church and Bible study. Tr. at 112. She testified she watched CNN and Chicago PD on television and used a computer and her phone to access social media, research, and communicate with family and friends. *Id.*

Plaintiff stated she experienced migraine headaches two to three times a week, depending on her stress level. Tr. at 113. She noted her most recent one had lasted two-and-a-half hours. *Id.* She said she would take her medication, use a heating pad, and lie down in a dark room to relieve migraines. *Id.* She indicated any light or noise intensified her headaches. *Id.*

Plaintiff testified she had been prescribed a back brace, a knee brace, and a walking cane. *Id.* She said she was first prescribed a cane around 2012 and had requested a new one after it broke. Tr. at 114. She indicated she

initially used the cane for long distances and started using it more frequently in 2018. Tr. at 115–16. She stated she used the cane outside of her home. Tr. at 116.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Barbara H. Azzam reviewed the record and testified at the hearing. Tr. at 117–34. The VE categorized Plaintiff's PRW as a vocational training instructor, *Dictionary of Occupational Titles* ("*DOT*") No. 097.221-010, requiring light exertion and a specific vocational preparation ("SVP") of 7; a cashier/checker, *DOT* No. 211.462-014, requiring light exertion and an SVP of 3; a cosmetologist, *DOT* No. 332.217-010, requiring light exertion and an SVP of 6; a beauty shop manager, *DOT* No. 187.167-058, requiring light exertion and an SVP of 7; a customer complaint clerk, *DOT* No. 241.367-014, requiring sedentary exertion and an SVP of 5; and an administrative secretary, *DOT* No. 169.167-014, requiring sedentary exertion and an SVP of 8. Tr. at 119–20. The ALJ asked the VE if the job of administrative secretary was classified based on the military context or the civilian equivalent. Tr. at 120. The VE stated she had identified the civilian equivalent. *Id.* She noted Plaintiff's military training would have required at least a medium level of exertion. Tr. at 121. She further indicated Plaintiff might have worked composite jobs in the military and as a cosmetologist and beauty shop manager. *Id.*

The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at the light exertional level requiring: frequent operation of bilateral hand controls; occasional bilateral overhead reaching; frequent bilateral handling and fingering; occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, and crouching; no crawling; no working at unprotected heights; avoiding concentrated exposure to dust, odor, fumes, pulmonary irritants, and extremes of cold and heat; requiring exposure to no more than moderate, level 3 noise; capable of simple and routine tasks; making simple work-related decisions regarding use of judgment and dealing with change in a routine work setting; requiring no greater than incidental interaction with the public; and accommodating any need to be off-task with ordinary breaks. Tr. at 121–22. The VE testified the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 122. The ALJ asked whether there were any other jobs in the economy the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of 2 as a mail room clerk, *DOT* No. 209.687-026, a shipping clerk, *DOT* No. 222.387-074, and a product marker, *DOT* No. 209.587-034, with 100,000, 60,000, and more than 500,000 positions in the national economy, respectively. Tr. at 124.

For a second hypothetical question, the ALJ asked the VE to consider the individual previously described and to further assume she would require

the use of a handheld assistive device in the nature of a cane for prolonged ambulation, ascending or descending slopes, and traversing over uneven terrain. Tr. at 124–25. He asked the VE if that would have any impact on the jobs she previously identified. Tr. at 125. The VE stated it would not. *Id.*

As a third hypothetical question, the ALJ asked the VE to consider the individual described in the first hypothetical question and to further assume she would require a sit/stand option, defined as a brief postural change at or near the workstation, no more frequently than two times per hour, for a duration of no longer than five minutes. *Id.* The ALJ asked if the additional restriction would affect the jobs the VE previously identified. *Id.* The VE testified the individual would be able to perform the jobs previously identified, but the number of jobs would be reduced by roughly 50% to eliminate employers who would not accommodate a need to alternate sitting and standing. *Id.*

For a fourth hypothetical scenario, the ALJ asked the VE to consider the individual described in the first question, but to consider she would be limited to occasional bilateral operation of hand controls and occasional bilateral handling and fingering. Tr. at 125–26. He asked if the additional restrictions would affect the jobs the VE previously identified. Tr. at 126. The VE testified it would preclude all the jobs offered in response to the first

question. *Id.* He further noted he was unable to identify any jobs that would allow for those restrictions. Tr. at 126–27.

As a fifth hypothetical question, the ALJ asked the VE to consider the individual described in the first question, but to further assume she would be reduced to work at the sedentary exertional level. Tr. at 127. The ALJ asked if there would be jobs available. *Id.* The VE identified sedentary jobs with an SVP of 2 as a document scanner, *DOT* No. 249.587-018, a table worker, *DOT* No. 739.687-182, and an inspector, *DOT* No. 669.687-014, with 300,000, 100,000, and 200,000 positions in the national economy, respectively. Tr. at 127–28.

For a sixth hypothetical question, the ALJ asked the VE to consider the restrictions in the fifth question and to further assume the individual would require a sit/stand option, as previously defined. Tr. at 129–30. He asked if the individual would be able to perform the jobs the VE previously identified. Tr. at 130. The VE testified the individual could perform the same jobs, but the available number would be reduced by 50% for those employers that would not allow a sit/stand option. *Id.*

For a seventh hypothetical question, the ALJ asked the VE to consider the fifth question and to assume the individual would require a handheld assistive device for the activities previously described. *Id.* He asked if the

sedentary jobs the VE previously identified would remain available. *Id.* The VE testified the same jobs would remain available in the same numbers. *Id.*

For an eighth hypothetical question, the ALJ asked the VE to consider the sedentary hypothetical question and to further assume the individual would be limited to occasional use of bilateral hand controls and occasional bilateral handling and fingering. *Id.* He asked if the additional restriction would eliminate the jobs identified in response to the sedentary hypothetical question. *Id.* The VE confirmed it would eliminate those jobs and all other work. Tr. at 130–31.

The ALJ asked the VE to describe the normal break pattern in the workplace and to indicate at what point off-task behavior would result in elimination of all work. Tr. at 131. The VE explained most employers provide a break approximately every two hours, equating to a 15-minute morning break, a 30- to 60-minute lunch break, and a 15-minute afternoon break. *Id.* He testified most employers would accept an employee's off-task behavior for another 10% of the workday, in addition to those breaks, on an ongoing and sustained basis. *Id.* However, he added that any time off-task beyond 10% in addition to normal breaks would preclude all work activity. *Id.*

The ALJ asked the VE to indicate at what point an individual's cumulative and consistent absenteeism would render her unemployable. Tr. at 132. The VE explained most employers would tolerate up to one absence

per month on an ongoing and sustained basis, but that consistently exceeding one absence would preclude all work. *Id.*

The ALJ questioned the VE as to the consistency of her testimony with the *DOT*, stating:

> Now, to this point, your testimony has been conforming and consistent with the *DOT* and its companion publications, except they do not address the sit/stand, the use of the assistive device, time off task, absenteeism, differentiation between one upper extremity or the other, overhead versus directional reaching, climbing . . . ladders, ropes, and scaffold versus ramps and stairs, so on those factors, your testimony's conforming and consistent with the *DOT* and its companion publication but also considers your training, your education, and your work experience, correct?

*Id.* The VE confirmed that was correct. *Id.* The ALJ further established the VE's testimony as to mental limitations was based on general educational development ("GED") scales included in the *DOT* and its companion publications, the claimant's vocational factors, the limitations included in the RFC assessment, and her training, education, work experience, and familiarity with jobs, as the *DOT* does not directly address interactions and temperaments in the workplace. Tr. at 132–33.

The ALJ asked the VE to explain the implication of a marked loss in the ability to perform one of the basic mental demands for unskilled work. Tr. at 133–34. The VE stated such a loss would render the individual unemployable. Tr. at 134.

The ALJ asked the VE to explain the implication of an inability to maintain work on a consistent basis, eight hours a day over a 40-hour workweek. *Id.* The VE confirmed this would eliminate all jobs. *Id.*

The ALJ confirmed the VE's additional testimony had been consistent with the *DOT* and its companion publications, as supplemented by her training, education, and work experience. *Id.*

### 2.    The ALJ's Findings

In his decision dated May 11, 2021, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2018.
2.  The claimant has not engaged in substantial gainful activity since April 20, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.  The claimant has the following severe impairments: sciatica, Post-traumatic stress disorder (PTSD), anxiety, degenerative joint disease (meniscal tear non surgically treated) right knee, patellofemoral pain syndrome left knee, and mild chondromalacia left knee (20 CFR 404.1520(c) and 416.920(c)).
4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can lift 10 pounds occasionally and less than 10 pounds frequently. She can sit for six hours, stand for two hours, and walk for two hours. She can push/pull as much as can lift/carry. She can operate hand controls with right hand frequently. She can operate hand controls with left hand frequently. She can occasionally reach[] overhead on a bilateral

basis. She can handle items frequently and bilaterally. The claimant can climb ramps and stairs occasionally, never climb ladders, ropes, or scaffolds, balance occasionally, stoop occasionally, kneel occasionally, crouch occasionally, and never crawl. The claimant can never work at unprotected heights. She must avoid concentrated exposure to: dust, odors, fumes and pulmonary irritants; to extreme cold and extreme heat. She must be limited to a work environment with a moderate noise or less (a level 3 or less). She is able to perform simple, routine tasks. She is able to make and perform simple work-related decisions as to use of judgment and dealing with changes in a routine work setting. She can only have incidental interactions with the public. The claimant's time off task can be accommodated by normal breaks.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born April 24, 1977 and was 39 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 20, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 17–29.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not assess Plaintiff's RFC in accordance with SSR 96-8p and Fourth Circuit precedent;

2)    the ALJ erred in declining to accord substantial weight to the VA's 100% disability rating;

3)    the ALJ failed to resolve apparent conflicts between the VE's testimony and the information in the *DOT*;

4)    the ALJ declined to address evidence suggesting she had limited ability to interact with coworkers; and

5)    the ALJ neglected to undertake a function-by-function analysis and apply the proper regulatory framework in assessing her RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that

she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound

foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    B.    Analysis

        1.    RFC Assessment

Plaintiff argues the ALJ did not comply with SSR 96-8p and Fourth Circuit precedent in assessing her RFC. [ECF No. 18 at 14]. She maintains the ALJ's restrictions to simple, routine tasks and unskilled work fail to account for her limitations in maintaining concentration, persistence, or pace. *Id.* at 14–19. She further argues the ALJ did not account for the restrictions the state agency consultants identified in their mental RFC assessments. *Id.* at 18–19. She contends the ALJ improperly rejected her treating psychiatrist's opinion. *Id.* at 19–25. She claims the ALJ mischaracterized and discounted her subjective symptoms and complaints, cherry-picked the evidence, and failed to explain how her ADLs were inconsistent with her allegations. *Id.* at 25–29.

The Commissioner argues substantial evidence supports the ALJ's RFC determination. [ECF No. 20 at 11]. She maintains the ALJ accounted for

Plaintiff's moderate limitation in concentration, persistence, or pace through multiple, specific provisions in the RFC assessment. *Id.* at 11. She notes the regulations were updated after the court's decision in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015), to specify that moderate limitations were consistent with "a 'fair' ability to sustain concentration, persistence, or pace 'independently, appropriately, effectively,' and 'on a sustained basis.'" *Id.* at 12–14. The Commissioner contends Dr. Cheng's letter stating Plaintiff's PTSD was "permanently disabling" and that she could not "sustain gainful employment" was not a medical opinion and neither valuable nor persuasive under the regulations. *Id.* at 15–16. She further maintains the ALJ appropriately noted the opinion was inconsistent with the other evidence of record. *Id.* at 16–17. She claims the ALJ considered the entire record in evaluating Plaintiff's statements as to the effects of her impairments and symptoms. *Id.* at 17–20.

Because Plaintiff's arguments center on the ALJ's consideration of her mental impairments in the RFC assessment, the court evaluates the same. If a claimant has a severe mental impairment that does not meet or equal the requirements for a finding of disability under the listings, the ALJ must consider how that impairment affects the claimant's RFC. SSR 96-8p, 1996 WL 374184, at *2. This requires the ALJ to set forth specific functional limitations to address evidence of impairment in any of the four areas of

mental functioning where he assessed limitations. *Id.* at *4. The ALJ must consider "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." *Id.* at *2 (emphasis in original); *see also* 20 C.F.R. §§ 404.1545(a)(4), (b), 416.945(a)(4), (b). "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.* In *Thomas v. Berryhill*, 916 F.3d 307, 311–12 (4th Cir. 2019), the court concluded the ALJ erred in drawing "no explicit conclusions about how Thomas's mental limitations affect her ability to perform job-related tasks for a full workday." Thus, where the record contains allegations that the claimant's mental impairments would prevent her from completing an eight-hour workday, five days a week, the ALJ must address such evidence.

The RFC assessment must thoroughly consider the claimant's complaints of symptoms and all medical source opinions. SSR 96-8p, 1996 WL 374184, at *7. "Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)); *see also* 20 C.F.R. § 416.929(b), (c). If the evidence supports a finding that the claimant's medically determinable impairments could reasonably be expected

to cause her alleged symptoms at the first step, she is "entitled to rely exclusively on subjective evidence to prove" her symptoms are "so continuous and/or so severe that [they] prevent [her] from working a full eight hour day" at the second step. *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006). The ALJ must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [her] history, the signs and laboratory findings, and statements by [her] medical sources or other persons about how [her] symptoms affect [her]." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Other evidence relevant to the evaluation includes: (1) the claimant's ADLs; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures the claimant uses or has used to relieve pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p, 2017 WL 5180304, at *6.

The ALJ should address the claimant's specific allegations as to areas of impairment and either provide functional limitations directed to the alleged difficulty or explain his reasons for declining to include additional limitations as to the alleged difficulty. SSR 96-8p, 1996 WL 374184, at *5. The ALJ must explain which of the claimant's symptoms he found "consistent or inconsistent with the evidence in [the] record and how [his] evaluation of the individual's symptoms led to [his] conclusions." SSR 16-3p, 2017 WL 5180304, at *8.

In cases filed on or after March 27, 2017, the ALJ is not to defer to or give any specific weight to a medical opinion based on its source, but must consider how persuasive she found all the medical opinions, given the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(b)(c), 416.920c(b), (c). Supportability is assessed by comparing the medical source's opinion to the objective medical evidence and supporting explanations he presents. 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). Consistency is evaluated by examining the opinion against the evidence from other medical sources and nonmedical sources in the claim. 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). Because supportability and consistency are considered the most important factors, they are the only factors the ALJ must explicitly discuss in assessing

the persuasiveness of a medical opinion. 20 C.F.R. §§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2).

The ALJ must cite specific medical facts and nonmedical evidence in explaining how the restrictions he included in the RFC assessment were consistent with the evidence and must explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7. "An ALJ has the obligation to consider all relevant evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869 (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

The ALJ included provisions in the RFC assessment for simple, routine tasks, simple work-related decisions as to use of judgment and dealing with changes in a routine work setting, only incidental interactions with the public, and accommodation of time off-task through normal breaks. Tr. at 22. He found Plaintiff's medically-determinable impairments could reasonably be expected to cause the symptoms she alleged, but concluded her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the evidence of record. Tr. at 23–24. The ALJ acknowledged evidence that supported Plaintiff's allegations, writing:

> According to the VA, the claimant is 100% disabled due to her PTSD (10F/59). The claimant sometimes presents as depressed or

anxious (B6F/181; B9F/37; B10F/931). She also consistently reports panic attacks and blackouts (B6F/237, B9F/37; B10F/603). The claimant often reports trouble concentrati[ng] (B6F/235, 351; B10F/237). She testified that her brain will frequently shut down and she feels like a "derailed train." She reports things that happened in the present and the past racing through her mind, "and it just runs" (B10F/660).

At one visit, she described going to a job interview. She was very anxious heading to interview for cashier at Walmart and started crying as soon as she arrived and fell apart. She had to go to a park and sit down to put herself together. She said to herself, "I quit." She clarified that this was not suicidal or homicidal intent, she just cannot deal with people or a job. She is scared of blacking out again. She remembers co-worker at her teaching job in which she pushed a girl into a vending machine when she was called "bitch." The claimant said she blacked out and she does not recall the encounter (B6F/385).

Tr. at 24–25. However, the ALJ concluded other evidence suggested Plaintiff was not as impaired as she alleged. Tr. at 25. He pointed to Plaintiff's period of non-compliance and her self-medicating with marijuana. *Id.* He cited Plaintiff's presentation as cooperative and fully oriented with normal memory, judgment, insight, speech, and thought content during most visits and her normal concentration on some occasions. *Id.* He referenced Plaintiff's understanding of medical instructions and lack of barriers to understanding or reading instructions. *Id.* He noted Plaintiff's ADLs that included mentoring youth and volunteering at a high school weekly, talking to her parents, maintaining a few close friends, setting alarms and reminders for medications, living alone, doing household chores, preparing meals, engaging

in a dating relationship, baking for others, and attending early childhood development classes on Wednesdays. *Id.*

Turing to Plaintiff's specific arguments, the undersigned has considered whether the ALJ failed to adequately account for moderate limitations in concentration, persistence, or pace in the RFC assessment. Evaluation of a claimant's ability to concentrate, persist, or maintain pace requires consideration of her "abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(E)(3). "[T]he nature of this area of mental functioning" encompasses the following non-exclusive functions:

> initiating and performing a task that you know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.

*Id.* "Moderate" limitation means the claimant has fair ability to function in the area independently, appropriately, effectively, and on a sustained basis. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(H)(2)(c).

The Fourth Circuit has "agree[d] with other circuits that an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." *Mascio*, 780 F.3d at 638 (citing *Winschel v. Comm'r of Soc.*

*Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) (joining the Third, Seventh, and Eighth Circuits). The court agreed with the plaintiff's argument that "the ability to perform simple tasks differs from the ability to stay on task" and "[o]nly the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Id.* It considered remand appropriate based on the record before it "because the ALJ here gave no explanation." *Id.* However, the court recognized that a restriction to simple, routine tasks or unskilled work could account for significant restrictions to concentration, persistence, or pace if the ALJ provided an appropriate explanation. *See id.*; *see also Shinaberry v. Saul*, 952 F.3d 113, 121 (4th Cir. 2020) (explaining that in *Mascio*, the court "did not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC," but noting the ALJ must explain how she accounted for the limitation).

The ALJ specified he limited Plaintiff "to performing simple, routine tasks" because of "her issues with concentration." Tr. at 25. Although he noted Plaintiff's "time off task can be accommodated by normal breaks," Tr. at 22, he provided no explanation for this conclusion. Moreover, he failed to address and resolve all the evidence as to Plaintiff's ability to stay on task at a sustained rate. The ALJ's RFC assessment was consistent with his allocation of partially-persuasive authority to the state agency psychological

consultants' expectations that Plaintiff's mental impairments would not "preclude the performance of simple, repetitive work tasks in a setting that does not require on-going interaction with the public." *Compare* Tr. at 22, *with* Tr. at 147 and 163. However, he did not reconcile his RFC assessment with the consultants' impressions that Plaintiff would miss "an occasional day due to her mental illness" and had moderate limitations in her abilities to maintain attention and concentration for extended periods, work in coordination or proximity to others without being distracted by them, and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. *See* Tr. at 152–53, 168–69. Although "moderate" limitations are consistent with "fair" ability under the regulations, Drs. Farish-Ferrer and Werden represented Plaintiff had less-than-good ability to function in these areas. The ALJ stated he included greater restrictions than the psychological consultants suggested, but neither included restrictions in the RFC assessment to fully address the psychological consultants' impressions nor provided an adequate explanation for declining to do so.

The court next considers Plaintiff's argument that the ALJ failed to properly evaluate Dr. Cheng's opinion in assessing her RFC. If the record contains a statement as to a claimant's mental impairments, the applicable regulations define the statement as a medical opinion if it is "a statement

from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in "your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, coworkers, or work pressures in a work setting." 20 C.F.R. §§ 404.1513, 416.913. The ALJ considered Dr. Cheng's opinion unpersuasive, as "[m]edical evidence generated after that date, as well as some preceding that date, are not generally consistent with the statement made (B10F/821/823/57) and a finding of disability is an issue reserved to the Commissioner. *Id.*

The ALJ did not err in considering Dr. Cheng's impression that Plaintiff's PTSD symptoms would prevent her from finding and sustaining gainful employment, Tr. at 578. *See* 20 C.F.R. §§ 404.1520b(c)(3)(i), 416.920b(c)(3)(i) (explaining that because "[s]tatements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work" are inherently neither valuable nor persuasive, ALJs are not required to provide any analysis about how they considered such evidence in their decisions). Dr. Cheng's letter did not qualify as a medical opinion as defined in 20 C.F.R. § 404.1513 and § 416.913 because he did not provide an impression as to what Plaintiff could still do despite her impairments and

whether she had impairment-related limitations or restrictions in understanding, remembering, maintaining concentration, persistence, or pace, carrying out instructions, or responding appropriately to supervision, coworkers, or work pressures. Because Dr. Cheng's letter did not contain a medical opinion, the ALJ did not err in his persuasiveness evaluation.

Nevertheless, the ALJ's decision fails to reflect his consideration of Dr. Cheng's judgments about the nature and severity of Plaintiff's impairments, her medical history, the clinical findings, her response to treatment, and her prognosis in accordance with 20 C.F.R. § 404.1513(a)(3), § 404.1520(a)(3), § 416.913(a)(3), and § 416.920(a)(3). A review of the ALJ's decision does not show that he considered whether the symptoms Dr. Cheng identified of intrusive thoughts/memories, flashback nightmares, avoidance of public areas, hypervigilance, hyperstartle, and severely-impacted cognitive patterns and emotional regulation would affect Plaintiff's ability to complete a normal workday and workweek. One could reasonably assume such symptoms would impair Plaintiff's ability to interact appropriately in a workplace.

Plaintiff alleged her psychiatric symptoms would prevent her from completing a normal workday and workweek because she had difficulty focusing, would shut down when she felt overwhelmed, experienced extreme emotional reactions, sometimes blacked out, and had to lie down for much of the day due to low energy. Tr. at 98, 101–01, 111–12. Although the ALJ cited

Plaintiff's presentation during MSEs and her ADLs as inconsistent with her allegations, he failed to explain how they were inconsistent or how they supported a finding that she could do sustained work activities in an ordinary work setting on a regular and continuing basis, in accordance with SSR 96-8p. Plaintiff endorsed abilities to engage in a wide range of activities, but she maintained she could only do so for limited periods that were inconsistent with completion of an eight-hour workday. She further represented that her blackouts and emotional volatility would prevent her from performing work similar to that she performed as a volunteer in a competitive work environment. The ALJ failed to resolve this evidence in assessing Plaintiff's RFC.

In addition, the ALJ failed to address other evidence of record that was generally consistent with Plaintiff's statements, including abnormal findings on MSEs, missed and cancelled appointment, and evidence of sleep disturbance and a lack of energy. Plaintiff's mental health providers most often described her mood as depressed, dysthymic, down, tense, or difficult, her affect as constricted, ornery, or anxious, and her insight as limited. *See*, e.g., Tr. at 825, 828, 838, 978, 1002–03, 1044, 1098–99, 1119, 1779–80, 1817, 1846–47, 1884, 1919–20, 1952, 1976–77, 2078, 2187. They sometimes observed Plaintiff to be tearful during exams. *See* Tr. at 1381, 1779, 2007, 2187, 2194. The medical records reflected Plaintiff's difficulty adhering to a

schedule, as she often cancelled or failed to show up for medical appointments. *See, e.g.,* Tr. at 1273–86 (reflecting 28 cancelled and no-show appointments between January 2019 and January 2021). Plaintiff often complained of poor sleep and low energy. *See* 665, 673, 745, 823, 837, 978, 1083, 1043–44, 1083, 1342, 1758, 1779, 1799, 1840, 1963, 1975, 2185. Although a sleep study showed no evidence of sleep apnea, it was consistent with Plaintiff's complaints to the extent that it indicated only 64% sleep efficiency. *See* Tr. at 625. The ALJ did not reconcile any of this evidence with his RFC assessment.

Substantial evidence does not support the ALJ's decision, as he failed to consider all the relevant evidence, resolve conflicting evidence, and assess her RFC in accordance with 20 C.F.R. § 404.1513(a)(3), § 404.1520(a)(3), §§ 404.1529, 404.1545, § 416.913(a)(3), § 416.920(a)(3), § 416.929, 416.945, and SSRs 96-8p and 16-3p.

### 2.    Additional Allegations of Error

Plaintiff raises several additional allegations of error, maintaining the ALJ failed to properly credit the VA's 100% disability rating, did not adequately resolve an apparent conflict between the VE's testimony and information in the *DOT*, declined to address evidence suggesting she had limited ability to interact with coworkers, and neglected to undertake a function-by-function analysis and apply the proper regulatory framework in

assessing her RFC. *See generally* ECF Nos. 18 at 27. The court declines to

address Plaintiff's additional allegations of error, given the recommendation

of remand for the reasons discussed above.[5] Nevertheless, the undersigned

urges the parties to complete the record on remand with respect to Plaintiff's

VA disability decision and the examinations and medical opinions supporting

it.

> Changes to the regulations effective March 27, 2017, provide:
>
> Because a decision by any other governmental agency or nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules. Therefore in claims filed . . . on or after March 27, 2017, we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefit. However, we will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that we receive as evidence in your claim in accordance with § 404.1513(a)(1) through (4) [416.913(a)(1) through (4)].

20 C.F.R. §§ 404.1504, 416.904. Although the regulatory changes specify

ALJs are not required to address disability determinations from other

agencies directly, they require ALJs to consider any underlying medical

opinion forming the basis of the agency's decision in accordance with 20

C.F.R. § 404.1520c and § 416.920c. *See Charles F. v. Commissioner of Social*

---

[5] Accordingly, it is unnecessary to address the arguments the Commissioner presented in her reply to Plaintiff's response brief, ECF No. 31.

*Security*, C/A No. 19-1664-LJV, 2021 WL 9633585 (W.D.N.Y. Mar. 15, 2021) (finding the ALJ erred in declining to address medical opinions rendered after two C&P exams that explained how the claimant's impairments affected his ability to work and were included in disability determinations from the VA); *Joseph M. R. v. Commissioner of Social Security*, C/A No. 3:18-1779-B90R, 2019 WL 4279027 (D. Or. Sept. 10, 2019) (concluding the ALJ erred when "he failed to consider" and "provide legally sufficient reasons supported by substantial evidence" for rejecting an opinion from the physician who examined the plaintiff at the request of the VA in connection with his VA disability claim).

The VA assessed Plaintiff's combined service-connected disability impairment rating as 100% effective January 15, 2020. Tr. at 266. Records from the VAMC reflect rated disabilities for PTSD (100%), migraine headaches (50%), lumbosacral or cervical strain (40%), irritable colon (30%), bronchial asthma (30%), hemorrhoids (20%), limited flexion of right knee (10%), and limited flexion of left knee (10%). Tr. at 621. However, the record before the court contains no decisions from the VA explaining the evidence and conclusions that supported the assigned ratings and no C&P exams for PTSD or other mental impairments at any time during the relevant period.

During the hearing, the ALJ asked Plaintiff's counsel if he had received copies of the C&P exams and workup that led to the VA disability award. Tr.

at 88. Plaintiff's counsel indicated had not received this evidence. *Id.* The ALJ informed Plaintiff's counsel that he would give him 15 additional days to attempt to obtain that evidence. Tr. at 89. However, the record neither reflects submission of the C&P exams or other evidence underlying the VA disability finding nor contains any indication from Plaintiff's counsel that he attempted to obtain the evidence without success.

As any opinions and evidence that supports the VA's 100% disability rating and the individual impairment rating for PTSD may be relevant to Plaintiff's Social Security disability claim, the court commends the parties to supplement the record with this evidence on remand.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

February 22, 2022
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge